UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GLENN COE, *individually and on behalf of all others similarly situated*,

                              Plaintiff,

              v.

THE COCA-COLA COMPANY,

                              Defendant.

**DECISION AND ORDER**
22-CV-430S

## I.       INTRODUCTION

This is a diversity action in which Plaintiff Glenn Coe alleges that Defendant The Coca-Cola Company ("Coke") defrauded him and those similarly situated when it changed its product-reward program, named "My Coke Rewards," to its charitable-contribution program, named "Coca-Cola Give."  Presently before this Court is Coke's motion to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, et seq., and to then dismiss or stay the action pending the completion of arbitration.[1]  For the following reasons, this Court finds that Coke's motion should be granted, and that this action should be stayed pending the completion of arbitration.

## II.       BACKGROUND

### A.  Coe's Complaint

Coe alleges that Coke offered a reward program named "Coke Rewards" to encourage customers to purchase its products and services.  (Complaint, Docket No. 1,

---

[1] In support of its motion, Coke filed a memorandum of law (Docket No. 5-1); the Declaration of K. Reneé Hugee, with exhibits (Docket No. 5-2); and a reply memorandum of law (Docket No. 12).  Coe filed a memorandum of law in opposition (Docket No. 11).

¶¶ 2, 6.)  The program allowed customers to redeem bottle caps containing alphanumeric codes and other proofs of purchase for things of value, such as movie tickets and gift cards.  Id. ¶¶ 1, 6.  Coe began participating in the rewards program no later than 2016 and continues to participate in its current iteration.  Id. ¶ 57.

Coe maintains that several years after starting "Coke Rewards," Coke modified the program to replace the availability of prizes with the ability to participate in raffles and contests.  Id. ¶ 7.  According to Coe, the current program no longer provides anything of value to customers, but instead, requires customers to donate their accumulated rewards to pre-selected charities, such as the American Red Cross.  Id. ¶¶ 9, 10, 12, 58.  Coe maintains that had he known that his codes would lose all value, he would not have purchased Coke products or participated in the program, or would have done so on different terms.  Id. ¶¶ 40, 62, 64.

Coe asserts a number of claims.  He first alleges that the alphanumeric codes on the Coke bottle caps are unlawful "trading stamps," in violation of New York General Business Law Article 29-E, §§ 570, et seq.  Id. ¶¶ 13-26.  He further alleges that Coke's modifications to the rewards program violate New York General Business Law §§ 349 and 350.  Id. ¶¶ 76-81.  Further alleging a class action,[2] Coe claims that Coke's program modifications also violate other states' consumer-fraud laws.  Id. ¶¶ 42-48, 67-74, 82-86.  Coe also claims that the changes in the program constitute breaches of express and

---

[2] Coe alleges two subclasses: a New York class of all persons in New York who purchased Coke products and a "Consumer Fraud Multi-State Class" of all Coke purchasers in Idaho, Iowa, Kansas, Maine, Montana, Utah, West Virginia, and Wyoming.  See Complaint, ¶ 67.

implied warranties of merchantability and fitness for a particular purpose, and violate the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq. Id. ¶¶ 87-102. Finally, Coe asserts fraud and unjust-enrichment claims.[3] Id. ¶¶ 110-114.

### B. Facts Relating to Coke's Motion to Compel Arbitration

In support of its motion to compel arbitration, Coke submitted the Declaration of K. Reneé Hugee. Hugee is employed as Coke's Digital Consumer Experience Lead for its North America Operating Unit and serves as a qualified records custodian for Coke. See Declaration of K. Reneé Hugee ("Hugee Decl."), Docket No. 5-2, ¶ 1. Coe did not submit any evidence in opposition to Hugee's declaration or otherwise in support of his contention that arbitration should not be compelled. He submitted only a memorandum of law in opposition. The facts in Hugee's declaration are therefore undisputed.

As referenced in Coe's complaint, Coke offered a voluntary rewards program beginning in 2006 called "My Coke Rewards Program" (hereinafter, "My Coke"), whereby eligible purchasers of Coke products could collect points to redeem for a range of rewards. See Hugee Decl., ¶ 4. This program ended on July 1, 2017. Id.

On March 23, 2017, Coke launched a voluntary program called the "Coca-Cola Give Program" (hereinafter, "Coke Give"), which allows individuals to redeem codes found on Coca-Cola packaging to support various charities and non-profit organizations, such

---

[3] Coe has withdrawn his negligent-misrepresentation claim and requests for injunctive relief. See Complaint, ¶¶ 103-109, Wherefore (2), (3); Plaintiff's Memorandum of Law, Docket No. 11, p. 6 n.1.

as the American Red Cross, Children's Miracle Network, and the Boys and Girls Clubs of America.  <u>Id.</u> ¶ 5.  This program remains active today.  <u>Id.</u>

Coe admits that he participated in both the My Coke and Coke Give programs. <u>See</u> Complaint, ¶¶ 57, 60.  To participate in these programs, Coe was required to create an online account with Coke.  <u>See</u> Hugee Decl., ¶¶ 9, 10.  Coke's business records reflect that Coe created the required online account on or about January 7, 2015, and that it remains active.  <u>Id.</u> ¶¶ 6, 9.

### 1.  Terms of Use Governing Online Coke Account

To create an online account, eligible individuals had to agree to the applicable "Terms of Use" governing the program and online account.  <u>Id.</u> ¶¶ 9-12.  If an individual failed to accept the Terms of Use, the individual could not create an account and could not participate in the program.  <u>Id.</u> ¶ 11.  Coke's regular practice and procedure was to provide individuals creating online accounts with the Terms of Use that were in effect at the time, and to further provide subsequent updates to those terms as they occurred.  <u>Id.</u>

To participate in the initial My Coke program, individuals had to create an account and agree to the Terms of Use governing the My Coke program.  <u>Id.</u> ¶ 12.  The Terms of Use were presented to users on the online account-creation page.  <u>Id.</u>  Individuals confirmed their assent and acceptance of the Terms of Use by clicking a checkbox that appeared next to language that read, "**I agree to The Coca-Cola company <u>Terms of Use</u> and <u>Privacy Policy</u>**."  <u>See id.</u> ¶ 12 (emphasis in original) and Exhibit A (account creation page screenshot).  Both the Terms of Use and Privacy Policy contained

4

hyperlinks to the policies (as designated by the underlining), which policies were also accessible on the Coca-Cola website.  Id. ¶¶ 12, 13.  If an individual failed to mark the checkbox to accept the Terms of Use, the individual could not create an account or participate in the My Coke program.  Id. ¶ 14.  If an individual marked the checkbox, they then continued to create the account by clicking the "submit" button directly below.  Id. Exhibit A.  A true and correct copy of the account-creation page follows.

## Create an Account

Please enter your email address. We will send a verification code to that address to verify you own it. The code will expire in 15 minutes.

Email Address*

Send Verification Code

First Name*                          Last Name*

Password*

Password must contain at least:
8 characters, 1 uppercase letter, 1 lowercase letter, 1 number, 1
special character (e.g !@#$%^&*(_-]) and no spaces.

Birth Date*

Month          Day          Year

Zip Code*

☐ I agree to receive email from The Coca-Cola
Company about its brands and promotions.

☐ I agree to The Coca-Cola Company Terms of
Use and Privacy Policy*.

n/a62739e6-ccaa-4a4a-831c-416177dae1ea/B2C_1A_AccountMerge_SUSI_WEB/api/CombinedSign

Submit

Already have an account? Log In.

This site is protected by reCAPTCHA and the Privacy Policy and
Term of Service apply.

---

TERMS

PRIVACY

DO NOT SELL MY PERSONAL INFORMATION

See Hugee Decl., ¶ 12 and Exhibit A.

Coke's Terms of Use contain a mandatory-arbitration provision that is briefly described at the beginning of The Coca-Cola Company Terms of Use and Sale document as follows: "Any dispute must be filed in arbitration, in Georgia (unless a small claims court can hear it)." Id. ¶¶ 15, 16 and Exhibit B, p. 1 (full Terms of Use and Sale document). The beginning of the document warns that Coke may change the terms at any time, and it further advises that use of Coke's websites, mobile applications, and social media pages, evidences the user's agreement to the Terms of Use and Sale provisions. Id. ¶¶ 17, 19 and Exhibit B, p. 1. Finally, the beginning of the document contains the following statement: **THESE TERMS INCLUDE AN AGREEMENT TO SUBMIT ALL DISPUTES TO INDIVIDUAL MANDATORY ARBITRATION – PLEASE READ CAREFULLY**. Id. ¶ 17 and Exhibit B, p. 1 (all emphasis in original).

6

On the fourth page of the Terms of Use and Sale document, there is a section entitled, "**DISPUTE RESOLUTION TERMS (PLEASE READ CAREFULLY)**."  Id. ¶ 17 and Exhibit B, p. 4 (all emphasis in original).  This section explains the terms of the mandatory-arbitration provision as follows:

> **Choice of Arbitrator and Rules.** Any disputes, claims, and causes of action arising out of or connected with your use of the Sites (each, a "Dispute"), including without limitation a purchase through the Sites, must be submitted exclusively to the American Arbitration Association (AAA) to be heard under their Consumer Arbitration Rules. If for any reason, AAA is unable or unwilling to conduct the arbitration consistent with these terms, you and we will pick another arbitrator pursuant to 9 U.S. Code § 5.
>
> **Mandatory (Individual) Arbitration.** You agree that any Dispute between us shall be resolved exclusively in individual (non-class) arbitration. The parties intend to be bound to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. An arbitration means there will be no jury, and no judge.
>
> **Scope of Arbitration.** The arbitrator shall exclusively determine all issues as to the Dispute, applying these Terms. The arbitrator shall also determine any question as to whether any Dispute or issue is subject to arbitration. The arbitrator shall not have the power to hear any Dispute as a class action, mass action, or representative action. The arbitrator shall not have any power to issue relief to anyone but You or us.

**Exception to Arbitration (Small Claims Court).** Disputes that can be fully resolved in small claims court need not be submitted to arbitration.

**Choice of Venue (Fulton County, Georgia).** You agree that any Disputes shall be heard exclusively in Fulton County, Georgia unless otherwise agreed to by the Parties or determined by the arbitrator. You consent to jurisdiction in the State of Georgia for all purposes.

**Choice of Law (Georgia).** These Terms and your use of the Sites are governed by the laws of the State of Georgia, U.S.A., without regard to its choice of law provisions. However, any determination as to whether a Dispute is subject to arbitration, or as to the conduct of the arbitration, shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

**Class Action Waiver.** You agree that any Dispute between us shall be resolved in an individual action. Under no circumstances will you file, seek, or participate in a class action, mass action, or representative action in connection with a Dispute.

**Remedies Available in Arbitration.** The arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case, except injunctive relief.

> **<u>Injunctive Relief.</u>** The arbitrator may not issue any injunction. If either party in a Dispute seeks injunctive relief, the arbitrator will complete arbitration of the Dispute, issue an award of monetary compensation (if any), and then the party seeking injunctive relief may file a new action in state or federal court in Fulton County, Georgia, solely for injunctive relief. The findings of fact and conclusions of law of the arbitrator shall not be submitted as evidence or constitute precedent in this subsequent suit.

<u>Id.</u> ¶ 18 and Exhibit B, p. 4 (all emphasis in original).

### 2.   My Coke Program Rules

In addition to the Terms of Use governing Coe's online account with Coke, the My Coke program had its own set of rules.  Coke provided participants in the My Coke program with the "Program Rules" in effect at the time and any subsequent updates thereto.  <u>Id.</u> ¶ 20.  Similar to the Terms of Use governing online accounts, users were required to agree to the Program Rules before they could participate in the My Coke program.  <u>Id.</u>  Users also agreed to be bound by any changes to the Program Rules.  <u>Id.</u> ¶ 24 and Exhibit C ("My Coke Rewards Program Rules"), p. 1.

The Program Rules in effect when Coe began participating in the My Coke program contained a mandatory-arbitration provision.  <u>Id.</u> ¶¶ 20, 22, 24.  The provision provided as follows:

> As a condition of participating in this Program, each Member agrees that (1) any and all disputes, claims, and causes of action arising out of or connected with this Program, or any

> prizes or rewards obtained through the Program, shall be
> resolved individually, without resort to any form of class action
> and exclusively by arbitration under the Rules of the American
> Arbitration Association.  Arbitration will take place in Fulton
> County, Georgia; (2) any and all claims, judgments and
> rewards shall be limited to actual out-of-pocket costs incurred,
> including costs associated with participating in this Program,
> but in no event attorneys' fees; and (3) under no
> circumstances will any Member be permitted to seek recovery
> for, and Member hereby waives all rights to claim, punitive,
> incidental and consequential damages and any other
> damages, other than for actual out-of-pocket expenses and
> statutory damages, and waives any and all rights to have
> damages multiplied or otherwise increased.

Id. ¶ 24 and Exhibit C, pp. 9-10.

The Program Rules also provide that the laws of the State of Georgia apply to any

disputes concerning the Program Rules as follows:

> All issues and questions concerning the construction, validity,
> interpretation, and enforceability of the Program Rules, or the
> rights and obligations of Member and the Sponsor in
> connection with the Program, shall be governed by, and
> construed in accordance with, the laws of the State of
> Georgia, without giving effect to any choice of law or conflict
> of law rules or provisions (whether of the State of Georgia, or
> any other jurisdiction) that would cause the application of the
> laws of any jurisdiction other that the State of Georgia;
> provided, however, that any issues or questions arising out of
> Member's participation in a promotion governed by specific
> rules that provide for the application of the laws of another
> jurisdiction shall be governed by the law of the jurisdiction
> stated in those rules.

Id. ¶ 24 and Exhibit C, p. 10.

Coe agreed to these Program Rules when he created his online account and

began participating in the My Coke program.  See Complaint, ¶ 57; Hugee Decl., ¶ 25.

10

Coe further agreed to be bound by any changes in the Program Rules, including the updates that were made in January 2017.  See Hugee Decl., ¶¶ 25-27.  The updated provisions remained substantially similar to the provisions set out above.  Id. ¶¶ 26-30 and Exhibit D (Updated My Coke Rewards Program Rules).

### 3.  Coke Give Terms and Conditions

On January 24, 2017, Coke announced the scheduled conclusion of the My Coke program and the launch of the Coke Give charity-focused donation program, set to begin on March 23, 2017.  Id. ¶¶ 31, 32.  Coke closed the My Coke website on July 1, 2017, and directed all internet traffic to Coke.com.  Id. ¶ 33.  Former My Coke participants could use their log-in information and existing account credentials to participate in Coke Give. Id.

Coke Give had its own Terms and Conditions.  Coke provided participants in the Coke Give program with the governing Terms and Conditions in effect at the time and any subsequent updates thereto.  Id. ¶ 34.  Participants were required to agree to the Terms and Conditions before they could participate in the Coke Give program.  Id. Participants also agreed to be bound by any changes to the Terms and Conditions, which were last updated on September 12, 2018.  Id. ¶¶ 34, 36 and Exhibit E (Coke Give Terms and Conditions), p. 1.

The Terms and Conditions in effect when Coe began participating in the Coke Give program contained a mandatory-arbitration provision.  Id. ¶¶ 34, 38.  The provision provided as follows:

11

> As a condition of participating in Coca-Cola Give, each Account Holder agrees that (1) any and all disputes, claims, and causes of action arising out of or connected with Coca-Cola Give shall be resolved individually, without resort to any form of class action and exclusively by arbitration under the Rules of the American Arbitration Association. Arbitration will take place in Fulton County, Georgia; (2) any and all claims, judgments and rewards shall be limited to actual out-of-pocket costs incurred, including costs associated with participating in Give, but in no event attorneys' fees; and (3) under no circumstances will any person be permitted to seek recovery for, and such person hereby waives all rights to claim, punitive, incidental and consequential damages and any other damages, other than for actual out-of-pocket expenses and statutory damages, and waives any and all rights to have damages multiplied or otherwise increased.

Id. ¶ 38 and Exhibit E, p. 3.

The Terms and Conditions also provide that the laws of the State of Georgia apply to any disputes concerning the Terms and Conditions as follows:

> All issues and questions concerning the construction, validity, interpretation, and enforceability of these terms and conditions, or the rights and obligations of an Account Holder and the Sponsor in connection with Give, shall be governed by, and construed in accordance with, the laws of the State of Georgia, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Georgia, or any other jurisdiction) that would cause the application of the laws of any jurisdiction other that the State of Georgia; provided, however, that any issues or questions arising out of such person's participation in a promotion governed by specific rules that provide for the application of the laws of another jurisdiction shall be governed by the law of the jurisdiction stated in those rules.

Id. ¶ 38 and Exhibit E, p. 3.

Coe agreed to these Terms and Conditions when he began participating in the Coke Give program.  <u>See</u> Complaint, ¶ 57; Hugee Decl., ¶ 39.  Coe further agreed to be bound by any changes in the Terms and Conditions, including the updates that were made in September 2018.  <u>See</u> Hugee Decl., ¶¶ 34, 36, 39.

## III.   DISCUSSION

Coke moves to compel arbitration pursuant to the FAA, citing the mandatory-arbitration provisions recited above.  Coe maintains that he never agreed to arbitrate his claims against Coke and that the mandatory-arbitration provisions are unconscionable.

### A. Legal Standard

In resolving a motion to compel arbitration brought under the FAA, a court applies a standard similar to that applicable to a summary judgment motion, with all reasonable inferences drawn in favor of the non-moving party.  <u>See</u> <u>Nicosia v. Amazon.com, Inc.</u>, 834 F.3d 220, 229 (2d Cir. 2016); <u>Bensadoun v. Jobe-Riat</u>, 316 F.3d 171, 175 (2d Cir. 2003).  A court thus "consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file together with . . . affidavits."  <u>Nicosia</u>, 834 F.3d at 229 (quoting <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 155 (2d Cir. 2002)).

"If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried."  <u>Oppenheimer & Co., Inc. v. Neidhardt</u>, 56 F.3d 352, 358 (2d Cir. 1995).  Documents outside the pleadings may

properly be considered in deciding a motion to compel arbitration.  Molina v. Coca-Cola Enters., Inc., No. 08-CV-6370, 2009 WL 1606433, *1 n. 1 (W.D.N.Y. June 8, 2009).

The FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" Epic Sys. Corp. v. Lewis, 584 U.S. __, 138 S. Ct. 1612, 1621 (2018) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).  It further "reflects a legislative recognition of 'the desirability of arbitration as an alternative to the complications of litigation.'"  Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987) (quoting Wilko v. Swan, 346 U.S. 427, 431, 74 S. Ct. 182, 98 L. Ed. 168 (1953)).

To that end, a written agreement to submit a dispute to arbitration found in a commercial contract is generally "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  See 9 U.S.C. § 2; Daly v. Citigroup, Inc., 939 F.3d 415, 421 (2d Cir. 2019).  Doubts concerning the scope of arbitrable issues are resolved in favor of arbitration.  See Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.  There is, however, "no presumption in favor of arbitration where the parties dispute, as here, whether an obligation to arbitrate exists."  All Premium Contractors, Inc. v. Sunlight Fin., LLC., Case No. 1:23-cv-5059 (JLR), 2023 WL 6928777, at *4 (S.D.N.Y. Oct. 19, 2023) (citing Applied Energetics, Inc. v. New Oak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011)); see also AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986) ("arbitration is a

matter of contract and a party cannot be required to submit to arbitrate any dispute which he has not agreed so to submit") (citations omitted).

"In deciding a motion to compel arbitration, the question is first whether the parties agreed to arbitrate, and second, whether the dispute at issue comes within the arbitration agreement."  All Premium Contractors, 2023 WL 6928777, at *3 (citing ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002)); see also Daly, 939 F.3d at 421 (adding that, where necessary, the court must also determine whether Congress intended any asserted federal statutory claims to be nonarbitrable).  The Second Circuit has also described the inquiry as "[1] whether a valid agreement or obligation to arbitrate exists, and [2] whether one party to the agreement has failed, neglected or refused to arbitrate."[4]  Beijing Shougang Mining Inv. Co., Ltd. v. Mongolia, 11 F.4th 144, 162 (2d Cir. 2021) (citing LAIF X SPRL v. Axtel, S.A. de C.V., 390 F.3d 194, 198 (2d Cir. 2004)).  A party refuses to arbitrate if it commences litigation.  See id. at 162. Under any formulation, "[t]he threshold question facing any court deciding a motion to

---

[4] The Second Circuit has further described the inquiry in four parts: "(1) whether the parties agreed to arbitrate; (2) the 'scope' of the arbitration agreement; (3) whether the plaintiff's federal statutory claims are 'nonarbitrable'; and (4) if some, but not all of the clams in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration."  Abdullayeva v. Attending Homecare Servs. LLC, 928 F.3d 218, 221-22 (2d Cir. 2019) (citing JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004)). Here, Coe does not challenge the scope of the mandatory-arbitration provisions nor does he assert any nonarbitrable claims that would remain pending arbitration.  Moreover, Coe does not demonstrate that his federal claims under the Magnuson-Moss Warranty Act are nonarbitrable.  Indeed, the two circuit courts that have addressed the issue have held that claims brought under the Act are arbitrable.  See Davis v. S. Energy Homes, Inc., 305 F.3d 1268, 1280 (11th Cir. 2002); Walton v. Rose Mobile Homes LLC, 298 F.3d 470, 478 (5th Cir. 2002).

compel arbitration is . . . whether the parties have indeed agreed to arbitrate."  Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012).

### B.  Coke's Motion to Compel Arbitration

The party seeking to compel arbitration—here Coke—bears the burden of demonstrating that the parties entered a written agreement to arbitrate.  See Zachman v. Hudson Valley Fed. Credit Union, 49 F.4th 95, 101-02 (2d Cir. 2022); Barrows v. Brinker Rest. Corp., 36 F.4th 45, 50 (2d Cir. 2022).  "This burden does not require the moving party to show initially that the agreement would be *enforceable*, merely that one existed."  Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010) (summary order) (emphasis in original).  Once an agreement is established, the burden shifts to the non-moving party—here Coe—to counter with evidence supporting his position that no binding agreement to arbitrate was made.  See Barrows, 36 F.4th at 50.

### 1.  This Court will apply New York law.

The "threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles."  ExxonMobil Oil Corp. v. TIG Ins. Co., 44 F.4th 163, 175 (2d Cir. 2022) (quoting Nicosia, 834 F.3d at 229).  Federal courts "apply ordinary state-law principles that govern the formation of contracts" to determine whether parties agreed to arbitrate a particular dispute.  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995).

A district court sitting in diversity is required to apply the choice-of-law rules of the forum state.  See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 494-97, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941).  New York's rules first require a determination as to whether there is an actual conflict.  See Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (citing Matter of Allstate Ins. Co. & Stolarz, 613 N.E.2d 936, 937 (N.Y. 1993)).

Here, Coke initially urged that Georgia law applies, as provided in the contracts between the parties.  But in the face of Coe's contention that New York law applies, Coke relents and maintains that "[t]he Court . . . need not determine which law applies because New York and Georgia law both make clear that Plaintiff's arguments fail and that the Court should compel Plaintiff to arbitrate his claims."  Reply Memorandum, Docket No. 12, p. 2, n.1.  Since the parties appear to agree that New York law may properly be applied, and since Coe as the non-moving party advocates for the application of New York law, this Court will dispense with the choice-of-law analysis and apply New York law. See Curley, 153 F.3d at 12; Eisen v. Venulum Ltd., 244 F. Supp. 3d 324, 340 (W.D.N.Y. 2017).

To prove an enforceable contract under New York law, a party "must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade, 950 N.Y.S.2d 8, 9 (1st Dep't 2012).  Mutual assent may be expressed "by word, act, or conduct which evinces the intention of the parties to contract."  Minelli Constr. Co. v. Volmar Constr., Inc., 917 N.Y.S. 2d 687, 688 (2d Dep't 2011) (citations omitted).  "Where an offeree does not have *actual*

notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent."  Starke v. SquareTrade, Inc., 913 F.3d 279, 289 (2d Cir. 2019) (emphasis in original).  "In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention."  Id.

New York law requires that agreements be "construed in accord with the parties' intent."  Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002).  "The terms of an agreement provide the best evidence of what the parties intend, and 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of it terms.'"  Abdullayeva v. Attending Homecare Servs. LLC, 928 F.3d 218, 222 (2d Cir. 2019) (quoting Greenfield, 780 N.E.2d at 170).

### 2.  Coe and Coke entered a binding agreement to arbitrate.

Coke has demonstrated that the parties entered multiple written mandatory-arbitration agreements—those contained in the online account Terms of Use, in the My Coke Program Rules, and in the Coke Give Terms and Conditions.  It has therefore met its initial burden of demonstrating that the parties entered a written agreement to arbitrate. See Barrows, 36 F.4th at 50 (finding that production of an arbitration agreement that appeared to bear the non-moving party's electronic signature met the initial burden).

The burden now shifts to Coe to counter "with at least '*some evidence* . . . to substantiate [his] denial' that an agreement had been made."  See id. (quoting Interocean

Shipping Co. v. Nat'l Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972) (emphasis in original)).  As previously indicated, however, Coe has submitted *no* evidence to support his claim that he never agreed to arbitrate.  Instead he raises two legal arguments.

Coe first maintains that there was no "meeting of the minds" or mutual assent to the mandatory-arbitration provisions in Coke's Terms of Use because he did not have sufficient notice of them.[5]  In so arguing, Coe essentially challenges the reasonableness of Coke's web-based interface.

Arbitration is a matter of contract.  See Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010).  "It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'"  Starke, 913 F.3d at 288-89 (2d Cir. 2019) (quoting Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999)).  "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  Id. at 289 (citing Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541, 543 (N.Y. 1981)).  "Generally, courts look to the basic elements of the offer and the acceptance to determine

---

[5] As will be discussed, Coe challenges only the initial mandatory-arbitration provisions contained in Coke's Terms of Use at the time he created his online account.  He offers no challenge to the mandatory-arbitration provisions individually set out in the My Coke or Coke Give programs, which he agreed to by continuing to use his account to voluntarily participate in those programs.  Each of those unchallenged provisions serves as an additional independent basis to compel arbitration.

whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract."  Id. (citation omitted).

As it relates to notice of contract terms, the Second Circuit has summarized the law as follows:

> Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent.  In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention.  This often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way.

Id. (emphasis in original, citations omitted).

These same principles apply to web-based agreements.  See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract law.").  There, the design and content of the interface must be examined to determine whether the contract terms were presented in a way that would reasonably put a user on inquiry notice.  See Starke, 913 F.3d at 289 (citing Nguyen v. Barnes & Noble, Inc., 763 F.3d 1171, 1177 (9th Cir. 2014) ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, court have refused to enforce the [ ] agreement.")).  An electronic "click" can signify assent, so long as the interface gives the user reasonable notice that the "click" will manifest assent to an agreement.  See Meyer

20

v. Uber Techs., Inc., 868 F.3d 66, 75 (2d Cir. 2017) (quoting Sgouros v. TransUnion Corp., 817 F.3d 1029, 1033-34 (7th Cir. 2016)).

      User interfaces that fail to present terms conspicuously (such as with bolding or capitalization), obscure terms (such as by mixing them with other multi-colored links in various locations), draw attention away from terms (such as by mixing in advertisements), or distract the user (such as by crowding the page with additional information) are less likely to be found to provide proper notice and manifestation of assent. See Nicosia, 834 F.3d at 233-38. Simpler interfaces that are uncluttered, that warn users that they are agreeing to certain terms, and that prompt users to read the terms via that warning, on the other hand, provide objectively reasonable notice, whether the user follows the hyperlink to the terms or not. See Meyer, 868 F.3d at 77-80.

      Coke's plain interface, set out above, put Coe on inquiry notice of the mandatory-arbitration provisions. Like the interface in Meyer, Coke's is uncluttered and warns users that they are agreeing to the hyperlinked Terms of Use and Privacy Policy by clicking the box and proceeding with the account creation. See Meyer, 868 F. 3d at 81. The check box is conspicuously displayed in bold and underlining at the bottom of the page in spatially reasonable font and size: "☐ **I agree to The Coca-Cola Company** **Terms of Use** **and** **Privacy Policy**." See Hugee Decl., ¶ 12 and Exhibit A. It is not obscured in any way, nor are there other hyperlinks, advertisements, or other distractions. The only other information appearing on the interface is a simple form requiring biographical and password information. The hyperlinked Terms of Use containing the mandatory-

21

arbitration provisions were thus clearly and conspicuously presented, providing Coe with reasonable notice.  See Meyer, 868 F.3d at 77-79; see also McDougall v. Samsung Elecs. Am., Inc., 23 Civ. 168 (LGS), 2023 WL 6445838, at *4 (S.D.N.Y. Oct. 3, 2023) (analyzing interface and concluding that it provided reasonable notice).

Whether Coe actually clicked the hyperlink and read the Terms of Use before agreeing to them is of no moment.  First, Coe submitted no evidence that he did not read the Terms of Use.  Second, a reasonable user of Coke's website would know that by clicking the "I agree" box, the user was agreeing to the Terms of Use accessible through the hyperlink.  See McDougall, 2023 WL 6445838, at *4.  Consequently, regardless of whether Coe actually clicked the hyperlink, he was sufficiently on notice of the Terms of Use.  See id. (citing Meyer, 868 F.3d at 79-80); see also Thorne v. Square, Inc., 20-CV-5119 (NGG)(TAM), 2022 WL 542383, at *19 (E.D.N.Y. Feb. 23, 2022) ("Whether Plaintiffs bothered to read the additional terms is of no moment; the user is still on inquiry notice." (cleaned up)); Feld v. Postmates, Inc., 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020) ("Whether [plaintiff] actually clicked on the hyperlinked terms to read the [Terms of Service] or the Privacy Policy is immaterial; what matters is that the notice of these terms was reasonably conspicuous.").

Turning to manifestation of assent, the undisputed record reveals that Coe expressly assented to the mandatory-arbitration provisions.  The check box signaling agreement with the Terms of Use is spatially and temporally coupled with the hyperlink containing the terms, as is the directly following "submit" button.  See Meyer, 868 F.3d at

80.  Moreover, Coe could not have created his account, which he concedes he created and continuously used, without affirmatively checking the "I agree" box directly beside the Terms of Use hyperlink and clicking "submit."  See McDougall, 2023 WL 6445838, at *4. Finally, the interface makes clear that by checking the box, the user agrees to the Terms of Use.  See Hugee Decl., ¶ 12 and Exhibit A ("**I agree to The Coca-Cola Company Terms of Use and Privacy Policy.**")  Consequently, by checking the box and completing his account creation, Coe unambiguously and affirmatively accepted the terms in the hyperlinked Terms of Use and Privacy Policy.  See McDougall, 2023 WL 6445838, at *4.

Accordingly, because Coe was on inquiry notice of the Terms of Use, and because he unambiguously manifested his assent to those terms, including the mandatory-arbitration provisions, the parties created a binding agreement to arbitrate.  See id.

### 3.  The mandatory-arbitration provisions are not unconscionable.

Coe's second challenge to the mandatory-arbitration provisions is that they are unconscionable.  An arbitration agreement is unconscionable under New York law if it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quoting Nayal v. HIP Network Servs. IPA, Inc., 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (in turn quoting Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828 (N.Y. 1988)).

Unconscionability has procedural and substantive elements.  See Gillman, 53 N.E.2d at 828.  The procedural element "concerns the contract formation process and the

23

alleged lack of meaningful choice; the substantive element looks to the content of the contract." Ragone, 595 F.3d at 121-22 (quoting State v. Wolowitz, 468 N.Y.S.2d 131, 145 (2d Dep't 1983); see also Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 207 (2d Cir. 1999) ("A contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (quotation marks omitted)).  "Procedural and substantive unconscionability operate on a sliding scale; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." Hojnowski v. Buffalo Bills, Inc., 995 F. Supp. 2d 232, 238 (W.D.N.Y. 2014) (quoting David v. No. 1 Mktg. Serv., Inc., 979 N.Y.S.2d 375, 378-79 (2d Dep't 2014)).

"Procedural unconscionability examines the contract-formation process and focuses on 'the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power.'" Eisen, 244 F. Supp. 3d at 341 (quoting Gillman, 73 N.Y.2d at 11).

Coe first argues that Coke's Terms of Use containing the mandatory-arbitration provisions are procedurally unconscionable because they constitute a contract of adhesion.  In so arguing, Coe highlights Coke's size, its bargaining power, and the take-it-or-leave-it nature of the Terms of Use.  But these arguments challenge the Terms of Use as a whole.  They do not specifically challenge the mandatory-arbitration provisions,

24

which is required under United States Supreme Court precedent.  See Rent-A-Center, 561 U.S. at 70-71 (explaining that arbitration provisions are severable and must be challenged and analyzed individually).  In any event, the Second Circuit recognizes that unbalanced bargaining power and take-it-or-leave-it provisions do not necessarily render an arbitration agreement procedurally unconscionable.  See Ragone, 595 F.3d at 122.

Coe's specific challenge to the mandatory-arbitration provisions themselves is his suggestion that he did not understand the word "arbitration," lacked sophistication in legal matters, and had no opportunity to study the provisions or consult a lawyer.  He further suggests that the arbitration provisions were buried in fine print within the Terms of Use document.  None of these arguments is persuasive.

Coe has presented no evidence, in affidavit form or otherwise, that he did not read the arbitration provisions, did not understand the word "arbitration," or otherwise lacked sophistication.  Moreover, it is clear from the nature of Coke's programs that there was no immediacy or time-is-of-the-essence required for participation.  Coe thus had ample opportunity to read and study the provisions, to educate himself on the meaning of "arbitration," and to consult a lawyer.

And there is no merit to the suggestion that the arbitration provisions were buried in fine print in the Terms of Use document.  To the contrary, the provisions are set out in the same font, size, and format as the rest of the Terms of Use provisions—no fine print. See Hugee Decl., ¶ 18 and Exhibit B, p. 4.  And unlike other provisions, the mandatory-arbitration provision contains an explicit directive to read the terms carefully: "**DISPUTE**

**RESOLUTION TERMS (PLEASE READ CAREFULLY**.”  Id.  Moreover, the very first full paragraph on the first page of the Terms of Conditions advises in bold, underlined, all-capped writing that, “**THESE TERMS INCLUDE AN AGREEMENT TO SUBMIT ALL DISPUTES TO INDIVIDUAL MANDATORY ARBITRATION – PLEASE READ CAREFULLY**.”  See Hugee Decl., ¶ 17 and Exhibit B, p. 1.   Consequently, Coe fails to demonstrate that the mandatory-arbitration provisions are procedurally unconscionable.[6]

As to substantive unconscionability, Coe raises no factual or legal arguments.  Instead, he simply requests a hearing to determine whether the Terms of Use were substantively unconscionable.  Again, however, Coe presents no specific challenge to the substantive reasonableness of the mandatory-arbitration provisions, nor does he raise any factual disputes.  A hearing is therefore unnecessary, and Coe's request for one is denied.  Making no meaningful arguments, Coe fails to demonstrate that the mandatory-arbitration provisions are substantively unconscionable.

### C. Leave to amend is denied.

At the conclusion of his memorandum of law, without any argument or elaboration, Coe makes a bare request for leave to amend his complaint.  See Plaintiff's Memorandum of Law, p. 13 (“For the foregoing reasons, the Court should deny Defendant's Motion or in the alternative grant leave to file an Amended Complaint.”).  Coe does not, however,

---

[6] Coe also suggests that the mandatory-arbitration provisions are procedurally unconscionable because they conflict with New York law governing trading stamp redemption.  The FAA, however, preempts state laws that may prohibit arbitration of a particular claim.  See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 341, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011) (“When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA.”).

explain what additional facts he would allege that would change the foregoing result, nor does he include a proposed amended complaint as required by this district's local rules. See Loc. R. Civ. P. 15 (a), (b).  Leave to amend is therefore denied.

### D.  This action must be stayed pending completion of arbitration.

Coke requests that this action be dismissed for lack of jurisdiction once arbitration is compelled or, in the alternative, stayed pending the completion of arbitration.  Section 3 of the FAA requires that a federal court action be stayed pending the completion of arbitration.  So too, the Second Circuit requires that a stay, not dismissal, be imposed: "[W]hile we recognize the impetus for a rule permitting dismissal, we conclude that the text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."  See Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015); see also Virk v. Maple-Gate Anesthesiologists, P.C., 657 F. Appx. 19, 20-21 (2d Cir. 2016) (summary order).  This action will therefore be stayed pending the completion of arbitration.

### IV.    CONCLUSION

A court must grant a motion to compel arbitration "if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." Ryan v. JPMorgan Chase & Co., 924 F. Supp. 2d 559, 561-62 (S.D.N.Y. 2013).  Such is the case here.  The undisputed evidence reveals that Coe and Coke agreed to arbitrate any disputes arising from Coe's participation in Coke's programs.  Because Coe's

27

challenges to that agreement fall flat, this Court is obligated to compel arbitration.  See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985).  Coke's motion will therefore be granted, and this action will be stayed pending completion of arbitration.

### V.    ORDERS

IT HEREBY IS ORDERED, that Defendant Coca-Cola Company's Motion to Compel Arbitration (Docket No. 5) is GRANTED.

FURTHER, that Plaintiff's requests for a hearing and to amend his complaint are DENIED.

FURTHER, that this action is STAYED pending the completion of arbitration.

FURTHER, that counsel must file a joint status report by May 1, 2024, advising this Court of the status of the arbitration proceedings.

SO ORDERED.


Dated:      November 14, 2023
            Buffalo, New York


                              s/William M. Skretny
                           WILLIAM M. SKRETNY
                           United States District Judge